**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES R. HAIGHT, | : | CIVIL NO: 1:13-CV-02438 |
| | : | |
| Petitioner, | : | (Judge Kane) |
| | : | |
| v. | : | (Magistrate Judge Schwab) |
| | : | |
| MARIROSA LAMAS, | : | |
| | : | |
| Respondent | : | |

## REPORT AND RECOMMENDATION

### I. Introduction.

In 2003, a jury in the Court of Common Pleas of Northumberland County convicted the petitioner, James R. Haight, of aggravated indecent assault, indecent assault, sexual assault, corruption of a minor, and endangering the welfare of a child in connection with the sexual abuse of his stepdaughter. Haight was sentenced to an aggregate term of thirteen to twenty-six years in prison. In this habeas corpus case, Haight claims that his trial counsel provided ineffective assistance of counsel during his state criminal trial by failing to call certain witnesses. For the reasons discussed below, we recommend that the Court deny the petition for a writ of habeas corpus.

## II.  Background and Procedural History.

In October of 2001, "police filed a complaint alleging [Haight] committed various sexual acts at 209 South Third Street, Sunbury on or about 1995 to 1996, when the victim was in the third grade." *Commonwealth v. Haight,* No. CR-01-1115, slip op. at 1 (C.C.P. Northumberland Sept. 29, 2004) (copy filed as *Doc. 23-7*).  Later, the trial court "granted the Commonwealth's Motion to Amend the Information [to allege that] the incidents occurred in the year 1994." *Id.*  Although Haight initially pleaded guilty to two counts of aggravated indecent assault, he later withdrew his guilty plea and proceeded to trial. *Id.*

### A.  The Trial.

Although the events underlying the charges occurred in 1994, Haight was not tried until March of 2003.  Edward Greco, Esquire, represented Haight at trial. The Honorable Robert B. Sacavage presided over the jury trial.  Five witnesses testified during the prosecution's case, and Haight testified as the defense's only witness.  We briefly summarize the trial testimony.

#### 1.  Megan Johnson.

Megan Johnson, who was sixteen years old at the time of trial, was the first witness to testify. *Doc. 23-2* (*Trial Transcript* at 35).  Haight is Megan's mother's ex-husband. *Id.*  Megan testified that in 1994, when Haight was still married to her

2

mother, he made her watch movies of people having sex and he wanted to do the stuff shown on the movies. *Id.* at 36.  She testified that Haight would take her clothes off and she would take his clothes off, and then he would put his fingers on her vagina and rub up and down. *Id.* at 37.  According to Megan, Haight never put his fingers inside her. *Id.* at 46.  Haight also had Megan touch his penis; he would make her put her hand around his penis and rub up and down. *Id.* at 42.  Megan also testified that Haight would put his mouth on her vagina. *Id.* at 38.  This happened a couple of times. *Id.*

According to Megan, she did not tell her mother what was happening because she knew her mother would not believe her, and Haight had told her that if she ever told, he would kill her. *Id.* at 42.  When Megan was in second or third grade, she did, however, tell her Aunt Grace about what Haight was doing. *Id.* at 38-39.  According to Megan, Grace took her to the Salvation Army, where she spoke to a preacher, and the Salvation Army then called Children and Youth Services. *Id.* at 39.

Grace then took Megan home, and Megan told her mother about what Haight was doing. *Id.* at 40.  Megan's mother got mad, kicked Grace out of the house, and then went to get Haight, who at that time was not staying at her house. *Id.* at 40-41.  Megan, her mother, and Haight then met with Children and Youth Services, and, at that point, Megan said that nothing had happened. *Id.* at 41.

According to Megan, she lied and said that nothing had happened because her mother had told her that she would be put in a foster home. *Id.* at 41, 43, & 51-52. Megan testified that her mother often made threats to put her in a foster home if she did not do what her mother wanted. *Id.* at 52.

According to Megan, on one occasion after she told her Aunt, Haight did the same thing to her. *Id.* at 43.  In 2001, Children and Youth Services came to Megan's house, and this time, she told them what had happened in 1994. *Id.* at 42. Also, at this time, her mother believed her. *Id.*

Megan testified that she gave a statement to the police, but she admitted that in that statement, she did not say that Haight put his mouth on her vagina or that she put her mouth on his penis. *Id.* at 46-47.  She also testified that when she spoke to her doctor about what had happened, she did not tell the doctor that Haight put his mouth on her vagina or that she put her mouth on his penis, but she testified that that is, in fact, what happened. *Id.* at 48-49.  Megan also testified that she did not initially tell Children and Youth Services that Haight had put his mouth on her vagina, but, according to Megan, after she spoke to her doctor, she felt that she had to tell, so when they came back to visit her again, she did tell them. *Id.* at 48-49.

Megan testified that in 1994, there were times when she saw John Shiffer, her uncle, but her mother was with her at those times. *Doc. 23-3* (*Trial Transcript at 51*).  On cross-examination, Megan testified that she did not remember anything

about whether, before the incident with Haight, she had claimed that her uncle had "got after" her. *Id.* at 54.

Megan testified that in 2001, Haight and her mother were not living together, but Haight and her mother would still talk and they were not fighting. *Id.* at 53.  According to Megan, in 2001, after she had talked to Children and Youth Services, Haight got a new girlfriend. *Id.* at 53-54.  Megan later, however, expressed some uncertainty about when Haight and his new girlfriend became a couple. *Id.* at 56.  Megan testified that she did not go to Children and Youth Services in 2001 in order to get Haight in trouble because he had a new girlfriend, and her mother did not tell her to go to Children and Youth Services because Haight had a new girlfriend. *Id.* at 56-57.  Megan did testify, however, that in 2001, she heard her mother saying not nice things about Haight's new girlfriend. *Id.* at 58.

### 2.  Grace Eisenhart.

Grace Eisenhart, Megan's aunt and Megan's mother's sister, was the next witness to testify.  Grace testified that in the fall of 1994, after Megan told her that Haight abused her, she took Megan to the Salvation Army to talk to the preacher there. *Id.* at 61-62.  After the Salvation Army, Grace took Megan home so that Megan could tell her mother. *Id.*  According to Grace, her sister was angry, accused Megan of lying, and accused her of telling Megan to say this. *Id.* at 63 &

70.  Grace denied telling Megan what to say. *Id.* at 75.  Grace testified that although before this, she and her sister had a good relationship, after this, she and her sister did not really talk again until January of 1996. *Id.* at 63 & 66.

Grace testified that in 1994, Megan would sometimes stay overnight at her house. *Id.* at 66.  John Shiffer is Grace's brother and Mr. Kashner is her stepdad, but, according to Grace, neither of them ever came to her house when Megan was there. *Id.* at 67.

Grace testified that around the time that Megan had gone to the police in 2001, she and Megan's mother blocked a moving van that was in front of Haight's girlfriend's house. *Id.* at 77.  According to Grace, they blocked the moving van after Megan had gone to the police because they were afraid that Haight was going to leave town. *Id.* at 79.  Grace testified that she called the police, and after the police told her that they could not block the van, she and her sister left. *Id.* at 79.

### 3.  Gloria Haight.

Megan's mother, Gloria Haight, testified next.  Gloria testified that she was married to Haight for about seven years, during which time she and Haight only occasionally lived together. *Id.* at 81.  Gloria and Haight's divorce was finalized around 1998. *Id.* at 52.

Gloria testified that when Megan and Grace told her about what Haight had done to Megan, she did not believe it and she got real upset and nasty. *Id.* at 82.

6

She told Grace to get out of her house, and she yelled and screamed at Megan, who was crying, and told her that they have a home for bad girls who lie. *Id.* at 82 & 85. Gloria testified that she did not believe Megan because she thought Grace had something to do with the accusations and because Haight was her husband. *Id.* at 83. She testified that at the time, which was near the end of 1994, she was not living with Haight. *Id.* According to Gloria, the day after Megan told her what Haight was doing, she, Megan, and Haight went to Children and Youth Services, and she told them that she did not believe that the accusations were true. *Id.* at 85.

Gloria testified that in 1994 there were times when Haight would babysit Megan and at times he would be alone with her. *Id.* at 84. Even after Megan told Gloria about what Haight was doing, there were times when Haight would spend time with Megan. *Id.* There were also times when he would stay overnight at Gloria's house. *Id.* at 97. Prior to the summer of 2001, Haight was seeing Megan on a regular basis and he was helping her with her paper route. *Id.* at 106.

Although Gloria did not believe Megan in 1994, she later changed her mind. Gloria testified that in 2001, she noticed that Haight would say how pretty Megan was getting and that she had a nice ass, and if Megan liked a boy, Haight would get real jealous. *Id.* at 91. In 2001, when Children and Youth Services came to the house again, the incidents from 1994 came up again. *Id.* at 91-92. During the summer of 2001, Children and Youth Services scheduled Megan for an

appointment with her family doctor, Dr. Bruno, and Gloria took Megan to Psychological Services and to the Sunbury Police Department. *Id.* at 92-93. At the police station, Gloria and Megan gave statements to Detective Quinn. *Id.* at 94.

In the summer of 2001, Haight was dating Linda Lahr. *Id.* According to Gloria, she was not jealous of Linda, and she denied making harassing phone calls to Linda or to Haight about Linda. *Id.* at 94 and *Doc. 23-4* (*Trial Transcript* at 102 & 104). Gloria testified that when she found out that Haight was moving, she parked behind Haight's moving van, and her sister parked in front of the van, blocking him in. *Doc. 23-3* (*Trial Transcript* at 94). The police, however, told her that she had to leave and that she could not block him in. *Id.* at 95. Gloria testified that she was concerned that Haight was moving and her concern was based on what he had done to Megan. *Doc. 23-4* (*Trial Transcript* at 105). Gloria denied telling Megan to make up stories about Haight or that she wanted to get even with Haight because he had a girlfriend. *Doc. 23-3* (*Trial Transcript* at 95).

Gloria testified that when she had behavior problems with Megan, she might have told Megan that if she did not do what she wanted, Megan would be sent to foster care. *Id.* at 98.

Gloria testified that there were allegations that John Shiffer, her half brother, fondled Megan when she was two or three years old. *Doc. 23-4* (*Trial Transcript* at 100 & 107). Although Gloria confirmed that there were allegations of fondling by

Shiffer, according to Gloria, she has no independent recollection of those allegations and she was told of those allegations only recently. *Id.* at 100, 107-108, and 111.  She also testified that there were allegations regarding Shiffer and her niece. *Id.* at 109.  Gloria testified that there were times when Shiffer would come to her house or she would see him at family reunions, weddings, etc. *Id.* at 101. Gloria later testified, however, that Shiffer would not be around Megan at family functions, and she was present the other times he was around Megan. *Id.* at 108.

### 4.  Linda Lahr.

Linda Lahr testified next.  Lahr testified that she was Haight's former girlfriend/fiancé; she was with Haight from March of 2001 until December 2001. *Id.* at 113.  Lahr testified that she first learned of the allegations that Haight sexually assaulted Megan through paperwork that Haight received from Children and Youth Services at the end of May of 2001 or beginning of June of 2001. *Id.* at 114.  At that time, Haight told Lahr that the allegations were not true, that Gloria was jealous of his relationship with Lahr, and that Gloria and Megan were making up the allegations to cause problems between him and Lahr. *Id.* at 115.

According to Lahr, Haight later, however, told her something different. *Id.* Lahr testified that after Haight had talked to the police, he took her to a park near the police station and decided to tell her the whole story before he gave a written statement to the police. *Id.*  More specifically, Lahr testified that she and Haight

were at the police station, Haight was being interviewed, the interview stopped, and she and Haight went to the park. *Id.* at 117.  Lahr testified that at the park, Haight admitted to her that he had performed oral copulation on Megan and that he had rubbed her "pussy" with his hand. *Id.* at 116.  According to Lahr, Haight told her that Gloria had told him that Megan was molested by her pappy and Uncle Johnny, and he felt like his sexual contact with Megan was helping her satisfy her needs. *Id.* at 117.  According to Lahr, Haight told her that the police had told him that he would be better off if he admitted to doing what he did and that way he could get counseling for himself. *Id.* at 131.  After Haight told Lahr these things, they returned to the police state and Haight spoke to Detective Quinn. *Id.* at 117-118.

Lahr testified that Detective Quinn wrote down what Haight said, Detective Quinn typed up Haight's statement, and then Haight read over and initialed each paragraph of the statement. *Id.* at 118.  Lahr identified the written statement that Haight gave to Detective Quinn, and she testified that Haight read the statement after it was typed and that she also read over the statement with Haight to make sure that he understood it. *Id.* at 118.  According to Lahr, Haight appeared to understand. *Id.*  Lahr identified the initials on the statement as Haight's initials, she pointed out the handwritten corrections that Haight made to the statement, and she testified that she witnessed Haight sign the statement. *Id.* at 119-120.  She also

testified that she saw Haight handwrite the note on the bottom of the statement that read: "I've never been more sorry about anything in my life and am seeking all help I can." *Id.* at 120.  Lahr also testified that below that note, she wrote the following "I, Linda A. Lahr, will be with James R. Haight during counseling and during the remainder of his life.  And I know he will never do anything like this again." *Id.*  Lahr also testified that Detective Quinn had read Haight the waiver-of-rights form and that he signed it. *Id.* at 121.  Lahr testified that Haight was not coerced into returning to the police station or into giving the statement to Detective Quinn. *Id.* at 123-124.

Lahr also testified about the incident when Gloria and her sister blocked the moving van. *Id.* at 122.  She testified that there were a lot of angry words exchanged. *Id.*  The incident occurred, according to Lahr, after she and Haight had spoken to Detective Quinn and they had let Detective Quinn know that they were moving. *Id.*  Lahr testified that at that point she did not really know Gloria, but she disliked her because Gloria tried to run her off the road.  *Id.* at 122-123.  According to Lahr, Gloria, who showed a lot of jealously toward her and was spiteful toward her, called her names and tried to spit on her. *Id.* at 123.  She also testified that Gloria called Haight's phone and left messages on his answering machine about her and that Gloria would follow her. *Id.* at 127 & 129.  She further testified that

Megan make derogatory comments to her; Megan would finish what Gloria was saying or copy what Gloria would say. *Id.* at 133.

### 5. Detective Quinn.

The final prosecution witness to testify was Detective Jamie Quinn of the Sunbury Police Department. *Id.* at 136.  After Detective Quinn received the referral from Children and Youth Service regarding Megan in July of 2001, she began arranging interviews with the people involved. *Id.* at 137.  Detective Quinn interviewed Megan, who told her that when she was in about the third grade, Haight fondled her genitals and had her manipulate his genitals and that this occurred over a period of time of about a month. *Id.* at 137-138.  According to Detective Quinn, Megan explained that when she initially spoke to Children and Youth Services, she would not talk to them because she was afraid that she would go to a foster home for kids that lie, as her mother had told her. *Id.* at 139. Detective Quinn testified that at the initial interview, Megan did not say anything about cunnilingus, but that later Gloria called and informed her that Megan was now saying that there had been oral sex. *Id.* at 138 & *Doc. 23-5* (*Trial Transcript* at 153 & 155).  Detective Quinn also interviewed Gloria, who told her how upset she was that she had not believed Megan back when it happened and that she didn't want to believe that Haight would have done this to her daughter. *Id.* at 139.

Detective Quinn also interviewed Haight. *Id.* at 140. She identified the

Miranda-rights-waiver form that Haight signed on July 27, 2001. *Id.* at 141.

According to Detective Quinn, Haight initially gave a verbal statement denying

any sexual contact with Megan and stating that Gloria had told him that Megan had

been abused in the past by John Shiffer. *Id.* at 142. Detective Quinn also identified

a written statement that Haight gave on July 27, 2001 in which he said he never did

anything to Megan. *Id.* at 143.

Detective Quinn testified that later, on September 21, 2001, she was present

for an interview of Haight conducted by Trooper Ken Davis. *Id.* Haight did not

make any admissions during this interview, and he left the police station. *Id.* at

144. But, according to Detective Quinn, about a half hour later, Haight returned to

the police station, asked to speak to her, and said he wanted to tell the truth. *Id.*

Lahr was with him. *Id.* Detective Quinn Mirandized Haight and had him sign the

rights-waiver form. *Id.* Detective Quinn testified that Haight appeared to

understand his rights, that she did not promise him anything, and that she did not

threaten him. *Id.* at 145.

During the interview, Detective Quinn took notes, and she then typed out the

statement for Haight because it was her understanding that he did not write well.

*Id.* at 146. Detective Quinn identified Haight's written statement, and she testified

that she went over each paragraph with Haight and read it to him, and asked him if

13

it was okay, and if he agreed, would he please initial that paragraph. *Id.* at 146.

Detective Quinn testified the Haight initialed each paragraph, and she testified

about several minor corrections that he made. *Id.* at 146-147, 148, & 149.

According to Detective Quinn, Haight then told her that everything that

Megan had reported to her and to Children and Youth Services had been the truth.

*Id.* at 145. Detective Quinn testified the Haight admitted that he had touched and

rubbed Megan's buttocks and genitals and that he had her rub and kiss his bare

penis. *Id.* at 147. Haight told Quinn that this had occurred when Megan was in the

third or fourth grade, that it happened four or five times, and that he stopped after

the initial report to Children and Youth Services in 1994. *Id.* Detective Quinn

testified that in his written statement, Haight said that Megan had been molested

before and that he recalled Gloria telling Megan not to say anything unless she

wanted to put Johnny and Pappy (Charles Kasher) in jail. *Id.* at 148.

Detective Quinn testified that in his written statement, Haight talked about a

sexual encounter with Megan in a sleeping bag when he touched and rubbed her

buttocks and genitals. *Id.* at 149. According to Detective Quinn, Haight also added

that Megan would touch and rub his penis, and that one time, he had her kiss his

penis. *Id.* at 149. Detective Quinn testified the Haight spoke about other times

when he was in the bathtub and Megan would come in naked and take his hand and

have him rub her genitals. *Id.* at 149. According to Detective Quinn, Haight said

that there was probably a time when he performed oral sex on Megan, but he does not really remember any details of that. *Id.* at 149.  He also said there was a time when he and Megan kissed on the mouth while she was naked on top of him. *Doc. 23-5* (*Trial Transcipt* at 150).  He denied penetrating Megan with his penis or his fingers. *Id.* at 150 & 162.  He also said that he did not show Megan pornographic movies, but they watched R-rated movies that contained scenes of people having sex and when those scenes came on he would ask Megan if she liked watching and if she said no, he would turn it off. *Id.* at 150.

Detective Quinn testified that Haight said that he put an end to the incidents with Megan because he knew it was wrong, that he never ejaculated during any of the encounters because he would realize how sick it was and he would tell Megan to stop, and that he would then take a bath to get it all off of him mentally because he knew it was wrong. *Id.* at 151.  The last paragraph of Haight's written statement says: "The above information is true and correct to the best of my knowledge.  I carefully read the statement which was typed for me by Detective Jamie L. Quinn of the Sunbury Police Department.  I have corrected any and all mistakes that were made on this statement, and I have initialed each paragraph." *Id.* at 151.  Detective Quinn testified that Haight signed the statement, that Linda Lahr, who was present at Haight's request, signed the statement, and that she signed the statement. *Id.* at 152 & 146.  According to Detective Quinn, she gave Haight the opportunity to add

whatever he wanted to the statement before it was completely finished and that is when he added the handwritten statement at the bottom that he has never been more sorry about anything in life. *Id.* at 152.  And then Linda Lahr asked if she could add something, and she did so. *Id.* at 152.  According to Detective Quinn, Haight seemed contrite during the interview and glad to have the truth out. *Id.* at 152.

After Haight gave his statement, Detective Quinn interviewed Megan a second time with the District Attorney present, and Megan disclosed that there had been oral sex. *Id.* at 154.  That interview, however, was never made part of the police record. *Id.* at 156.  Detective Quinn filed charges after that final interview with Megan. *Id.* at 154.

### 6. Haight.

Haight testified at the trial; he was the only defense witness.  Haight testified that he was married to Megan's mother in 1990 or 1991, that the relationship was on an off, and that they divorced in 1997. *Id.* at 169-170.  According to Haight, in 1994, he was living different places and one of those places may periodically have been Gloria's home, but he could not recall. *Id.* at 169.  Haight also testified that he could not recall if there were times when he may have been home alone with Megan. *Id.* at 170.

Even after their divorce, there were times when he would see Gloria, but it was not intimate and he stopped seeing Gloria altogether in 2001. *Id.* at 170-171. In 2001, Haight began to see Linda Lahr. *Id.* at 171. Haight testified the Gloria would make threats against Linda. *Id.* at 172.

Haight testified that he was "scared into" signing a statement that he understood his rights in September of 2001. *Id.* at 173. He testified that Trooper Davis hammered him with all kinds of questions, and that Trooper Davis told him that if he did not cooperate, Davis would make sure he died in prison. *Id.* at 174. According to Haight, Trooper Davis said that if he cooperated, he would not have to die in prison and he would probably just have to go to counseling. *Id.* at 174. Haight testified that he kept saying that he did not want to cooperate and say something happened when it did not. *Id.* at 174. According to Haight, Trooper Davis then told Haight that he would personally go to the judge and see that Haight dies in prison. *Id.* at 174. Trooper Davis did not touch Haight. *Id.* at 174. Detective Quinn was present only for parts of the interview with Trooper Davis. *Id.*

According to Haight, after Trooper Davis said that he would personally go to the judge and see that Haight dies in prison, Haight told Linda that he better do something and that is when he and Linda went to the park. *Id.* at 174-175. Haight initially testified that he did not recall telling Linda anything like she testified he said, and he later testified that he never told her the things that she testified about.

17

*Id.* at 175 & 181-183.  Haight testified the Linda said she would stick by him no matter what, and he told her he was going into to the police station and tell them whatever they wanted to hear. *Id.* at 184.  According to Haight, when he went back to the police station, he was willing to say anything and to sign anything just to get out of there. *Id.* at 175 & 181-182.

Haight was shown his written statement, and he admitted that he initialed the statement. *Id.* at 175.  According to Haight, he was scared. *Id.*  Haight testified that although in his written statement he admitted to having sexual contact with Megan, nothing like that ever happened. *Id.* at 176.  According to Haight, he made the statement because he did not want to die in prison, because Linda was being threatened at the time, and he thought he would get Linda out of trouble, get himself out of trouble, and spare Megan from having to go through all of this. *Id.* at 176.  According to Haight, he lied in his statement because he was so scared that he did not know what he was doing. *Id.* at 176.  He also testified that although his rights were read to him, he did not fully understand them. *Id.* at 176.  Haight also testified that Detective Quinn did not threaten him in any way and that she did not scare him. *Id.* at 181.

Haight testified that in 1994, the Children and Youth Services report was unfounded, and it was years later that the new allegations came out. *Id.* at 178.

Haight testified there were times when John Shiffer would be around Megan or the family. *Id.* at 178. He testified that back in 1994, whenever he was not around to help out, Gloria would drop the children off at the home where Shiffer lived. *Id.* at 178-179.

## B.  The Verdict and Sentence.

On March 14, 2003, the jury found Haight not guilty of two counts of involuntary deviate sexual intercourse, but it convicted him of sexual assault, aggravated indecent assault-forcible compulsion, aggravated indecent assault-victim less than 13 years of age, indecent assault-forcible compulsion, indecent assault-victim less than 13 years of age, corruption of a minor, and endangering the welfare of a child. *Id.* at 240-241. President Judge Sacavage sentenced Haight to a total term of imprisonment of thirteen to twenty-six years. *Commonwealth v. Haight,* No. CR-01-1115, slip op. at 1 (C.C.P. Northumberland Sept. 29, 2004) (copy filed as *Doc. 23-7*).

## C.  Haight's First PCRA Petition.

In October of 2003, Haight filed a Post Conviction Relief Act (PCRA) petition, and through counsel, Michael A. Rutt, Esquire, he filed an amended PCRA petition in February of 2004. *Commonwealth v. Haight,* No. CR-01-1115, slip op. at 1 (C.C.P. Northumberland Sept. 29, 2004) (copy filed as *Doc. 23-7*). In

his amended PCRA petition, Haight claimed that Greco was ineffective by failing to file a motion to suppress the statement to Detective Quinn, by failing to call any of the witnesses Haight had present at trial, by failing to address errors regarding Haight's sentence, and by failing to file an appeal to the Superior Court of Pennsylvania. *See Doc. 24* at 17.

### 1.  The Hearing.

In March of 2004, Judge Sacavage held a hearing on the amended PRCA petition. *Doc. 1-1* at 23.  Attorney Rutt represented Haight at the hearing. *Id.* Haight and his trial counsel, Edward C. Greco, Esquire, as well as Amber Bingaman and Louis Costa testified at the hearing.  We briefly summarize the testimony presented at the hearing.

### a.  Amber Bingaman.

Amber Bingaman testified that she and Haight are friends. *Doc. 1-1* (*PCRA Transcript* at 3).  She testified that she did not know Haight in 1994; she got to know him in 1996. *Id.* at 4.  According to Bingaman, on several occasions when she was at Haight's apartment, she heard messages on the answering machine from Gloria Haight where Gloria was coaching her young daughters to say "vulgar and nasty" things. *Id.* at 7-8.  She testified that she could hear Gloria in the background say something and then the girls would repeat what Gloria had said. *Id.* at 8.

Bingaman testified that on one occasion when she was at Haight's house, there were 20 different messages of Gloria coaching her daughters to say "very nasty vulgar messages." *Id.* at 9.  They would say things such as "you're a piece of shit" or "you're an ass." *Id.* at 15.  She testified that although vulgar, the messages were not accusations; nothing was said about Haight having sex with the kids. *Id.* at 17-18.  According to Bingaman, she had met Gloria several times and she was familiar with her voice as well as Megan's voice. *Id.*

Bingaman testified she heard the messages on three to five occasions. *Id.* at 9.  Haight would not answer the phone, and Gloria would repeatedly call back harassing him. *Id.*  According to Bingaman, she heard the messages before the charges were filed against Haight, approximately "8 or 9 months before the accusations came up." *Id.* at 14.

Bingaman testified that Attorney Greco never spoke to her, and she did not attend, or follow, Haight's criminal trial. *Id.* at 16.  But she testified that if she had gotten a subpoena, she would have testified at the trial. *Id.* at 4.

### b.  Louis Costa.

Louis Costa testified that he and Haight were friends, that he believed that Haight was innocent, and that he posted bail and paid Attorney Greco's attorney's fees for Haight. *Id.* at 19-20 & 22-23.  After the trial, Greco told Costa that he would file an appeal. *Id.* at 20-21.

Costa testified that in 1994, Haight was living in Elk County; he was not residing with Gloria or her daughter. *Id.* at 21.  According to Costa, Haight was at his mother's house in Elk County visiting relations. *Id.* at 24.  Costa testified that he took Haight up to Elk County and dropped him off, and he was not with Haight the entire time when Haight was in Elk County. *Id.* at 24-26.

Costa testified that he attended the trial, that Greco did not call him to testify, and that he would have been available to testify, if called. *Id.* at 21 & 26.

### c.  Haight.

Haight testified at the hearing that his statement to Detective Quinn was not true, that the things in that statement never happened, that when he gave his statement to the police he did not know what he was doing, that he has a fifth grade education, that he has problems with comprehension, and that he goes along with just about anything. *Id.* at 28-30 & 36.  According to Haight, he was afraid because he had been told that he would die in prison. *Id.* at 28.  He testified that "they" said that "they" would give him five to ten years if he would just say that he did it. *Id.* at 36.  He talked things over with his girlfriend who told him that five to ten years was "nothing" and who told him to go along with it and he would do only a short time in prison. *Id.* at 28 & 36.  Haight testified that Greco never filed a motion to suppress his statement. *Id.* at 28.

Haight testified that in 1994, he did not reside with Gloria and her daughter. *Id.* at 30.  According to Haight, he spoke with Greco about not living in the house in 1994, and he had witnesses to prove that who were present at the time of trial, but Greco said they could not testify. *Id.* at 31.  Haight added that he "was under the impression that we were talking about 1995." *Id.*  But then, according to Haight, he read that this was alleged to have happened in fall of 1994, and he wasn't even living there in 1994. *Id.* at 31.  According to Haight, Greco should have put his witnesses on the stand to testify about where he was, that he was not living with Gloria, and that he could not have been there. *Id.* at 33.

Although Costa testified about Haight living in Elk County in 1994, Haight testified that he only stayed in Elk County in 1994 for two weeks. *Id.* at 43. According to Haight, Costa was talking about a time Costa gave him "a ride to Elk County in 1996, early in the year, and I got picked up on a warrant up there . . ." *Id.* at 30.

Haight testified that he told Greco about Amber Bingaman and that she could testify about Gloria coaching the kids. *Id.* at 31.  He testified that Greco was going to call Bingaman. *Id.*  At trial, Haight asked where Bingaman was, and Greco said "Do you see her anywhere?" *Id.* at 31.  According to Haight, she was not there because she did not get her subpoena. *Id.* at 31.

Haight testified that after the trial, Greco told him that he would file an appeal, but Greco did not file an appeal. *Id.* at 32.  Months after the trial, Haight wrote to Greco asking how the appeal was going, and Greco told him that he was not retained to file an appeal. *Id.* at 32.

### d. Attorney Greco.

Attorney Greco testified at the hearing that he represented Haight at trial, but he did not represent him during early pretrial proceedings. *Id.* at 43 & 45.  Greco testified about why he did not file a motion to suppress Haight's statement to the police. *Id.* at 44-45 & 52.

Greco testified that Haight gave him names and some addresses of witnesses that he wanted to call, and Greco subpoenaed witnesses to testify. *Id.* at 45 & 53. But Greco did not call any of those witnesses. *Id.* at 53.  Greco testified that he based his decision not to call some of the witnesses on trial strategy and that he made that decision at the end of the Commonwealth's case. *Id.* at 63-64.

Greco discussed with Haight the fact that the dates when the incidents were alleged to have happened changed over time. *Id.* at 54.  According to Greco, in the discovery, the Commonwealth witnesses were, at times, vague, but he was able to narrow down a time period. *Id.* at 54.  When asked whether, once the dates were narrowed down, he looked into the whether Haight was actually living with the

24

victim at the time and whether he called any of Haight's witnesses, Greco

responded:

> A.  I believe – certainly, you look at everything.  And I would like to think I did at the time.  And, again, when we are dealing with the statements of Linda Lahr, I can't present some falsehood to the Court.  I mean, it was very damaging testimony that was presented.
> Q.  But you didn't call any of the witnesses he had here to testify to other things?
> A.  I don't – no, I probably made a decision or I definitely made a decision during the trial.  As I said, one of the best avenues that we were proceeding on was the – I guess it was Mr. Shiffer, the testimony.
> Q:  I don't think that is responsive to my question.  You didn't call – my question was, did you call any witnesses who were here?
> A:  And I think I said no.

*Id.* at 54-55.

Greco testified that Mr. Costa, who paid his fee and sat in on many

discussions, may have been one of those witnesses that was present at trial. *Id.* at

46.  Greco did not recall, however, Costa having anything to offer as an alibi. *Id.* at

46.  He also did not recall discussing with Costa where Haight was living at the

time of the allegations. *Id.* at 46.  Greco testified that he did not feel there was an

alibi and given Haight's confession, he was ethically constrained as to the nature of

the defense that he put on. *Id.* at 47.  He testified that it seemed like a good defense

to pursue questions regarding Shiffer. *Id.* at 47.

Greco recalled that there was some bad blood between Haight and Gloria, and he recalled statements Haight made about incidents involving Gloria and Linda, which came out at trial. *Id.* at 48. But he was not sure if Haight had told him about telephone calls that Gloria made to his residence. *Id.* at 48. He testified that in his view, derogatory statements made to Haight did not aid the defense:

> Q: Did any of those statements, derogatory things said to him, in your view, present any aid in his defense in the case?
> A: No. I mean, looking at the way the trial was going, during a trial, you need to be thinking ahead, you know, evaluating the evidence. If during the trial I felt that that would have been, you know, an aid to the defense, I certainly would have brought it out. And I may have brought it out during cross-examination of her. I didn't review the transcript, so I can't say for certain whether I did or I didn't. I may have pursued that. I think I was pursuing that more for the ex-girlfriend, but I may have brought that out.

*Id.* at 48.

Greco testified about why he did not file a direct appeal on behalf of Haight. *Id.* at 49-50 & 57-60.

## 2. The Decision.

Judge Sacavage granted in part and denied in part Haight's PCRA petition. *Doc. 1-1* at 90. He granted the petition as to Haight's claim that counsel failed to file a timely appeal, and he granted Haight thirty days to file an appeal *nunc pro tunc*. Judge Sacavage denied the PCRA petition as to all other issues. *Id.*

### D.  Haight's *Nunc Pro Tunc* Direct Appeal.

In May of 2004, Haight "timely filed a Notice of Appeal and pursuant to

Pa.R.A.P. 1925(b) raise[d] five issues on appeal." *Commonwealth v. Haight,* No.

CR-01-1115, slip op. at 1 (C.C.P. Northumberland Sept. 29, 2004) (copy filed as

*Doc. 23-7).*  Those five issues were (1) whether the evidence was sufficient to

sustain the verdict; (2) whether the verdict was against the weight of the evidence;

(3) whether Greco was ineffective by failing to file a motion to suppress;

(4) whether Greco was ineffective by failing to call any witnesses Haight had

present at this trial; and (5) whether Greco was ineffective by failing to address

errors regarding Haight's sentence. *Id.*

In an opinion pursuant to Pa.R.A.P. 1925,[1] as to the claim that Greco was

ineffective by failing to call witnesses, Judge Sacavage noted that at the PCRA

hearing, Haight limited this issue to two witnesses—Bingaman and Costa. *Id.* at 4

n. 2.  Judge Sacavage stated that Bingaman was not one of the witnesses that was

present at trial, and after summarizing her testimony at the PCRA hearing, he

concluded that there was no evidence the Greco knew she existed and, in any

event, Greco could have concluded that it would not benefit the defense to call her:

---

[1]  According to the Superior Court of Pennsylvania, a Rule 1925 opinion provides
a trial court with an opportunity to explain its trial and post-trial actions. *See
Commonwealth v. Clinton*, 683 A.2d 1236, 1239 (Pa. Super. Ct. 1996); *see also,
Hull v. Kyler*, 190 F.3d 88, 100-01, (3d Cir. 1999)(discussing Rule 1925).

> While this testimony may have been beneficial to question the mother and victim's intentions in accusing the defendant, Ms. Bingaman also testified that she didn't come to trial and trial counsel never talked to her.  Defendant did not testify at the P.C.R.A. hearing that he ever told trial counsel that this witness exists or what she would testify to.  As such, counsel cannot be deemed ineffective for failing to call a witness whom he did not know existed.
>
> Further, the message dealt only with name-calling.  None of the messages indicated anything about whether sex was had or not had with the kids.  As such, counsel could have concluded that calling this witness and attacking the victim would be more harmful to the defendant than helpful.

Id. at 4-5 (citations to record omitted).

As to Costa, Judge Sacavage reviewed Costa's testimony that Haight lived in Elk County in 1994, Haight's testimony that he only stayed in Elk County in 1994 for two weeks, and Greco's testimony regarding his ethical duty, in light of the damaging statements from Linda Lahr, not to present false testimony and his belief that "he made certain decisions during the course of the trial that were necessitated by the evidence and information that came out." *Id.* at 5.  Judge Sacavage observed that given that Haight was found not guilty on two of the most serious charges, Greco's trial strategy seemed to pay off. *Id.*  And he concluded that Greco had a reasonable basis for not calling Costa as a witness. *Id.*

Treating Haight's appeal as an appeal from the order denying his PCRA petition, the Superior Court affirmed the denial of relief as to the ineffective assistance claim regarding Greco's failure to call Bingaman and Costa:

28

> Height [sic] claims that trial counsel was ineffective for
> failing to call two alleged witnesses, Amber Bingaman and
> Louis Costa.  There was no showing at the PCRA hearing that
> trial counsel was ever made aware of Amber Bingaman or that
> she was available to testify.  While Louis Costa was known to
> trial counsel, he was purportedly an alibi witness.  However,
> although Costa would have testified that for a two-week period
> Haight was on vacation in Elk County, the proffered testimony
> did not cover a sufficient period of time to constitute alibi
> testimony or otherwise exculpate Haight.  Haight thus failed to
> demonstrate prejudice; accordingly, the PCRA court committed
> no error in rejecting this claim. ***See Porter, supra.***

*Commonwealth v. Haight,* No. 737 MDA 2004, slip op. at 4 (Super.Ct. June 27,

2005) (copy filed as *Doc. 23-8*).


### E.  Haight's Second PCRA Petition.

In February of 2006, Haight filed another PCRA petition. The court

appointed David Noon, Esquire, to represent Haight, and it ordered Noon to file an

amended petition within thirty days. *Doc. 23-9* at 2.  But Noon never filed an

amended petition. *See Commonwealth v. Haight,* No. 1992 MDA 2009, slip op. at

3 (Super. Ct. July 1, 2011) (copy filed as *Doc. 23-13*).  More than three years after

Noon was appointed to represent him, Haight filed a *pro se* petition for a writ of

habeas corpus in state court. *Id.*  Judge Sacavage dismissed that habeas petition,

and Haight appealed. *Id.*  The Superior Court noted that Haight's second PCRA

petition is actually considered a first PCRA petition because the first PCRA

petition resulted in Haight receiving the right to file a direct appeal *nunc pro tunc,*

and in those circumstances, a PCRA petition filed after a *nunc pro tunc* direct

appeal is treated as a first PCRA petition. *Id.* at 4. Because the PCRA petition was

treated as a first PCRA petition, the Superior Court held that Haight was entitled to

the representation of counsel as to the petition and that he was not afforded that

right since Noon took no action on behalf of Haight after being appointed. *Id.* at 4-

6. The Superior Court ordered the PCRA court to appoint new counsel for Haight,

and it directed that new counsel either file an amended PCRA petition or file a

petition to withdraw as counsel and a "no-merit" letter in accordance with

*Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988), and *Commonwealth v. Finley*,

550 A.2d 213 (Pa. Super. Ct. 1988) (en banc). *Id.* at 6.

On remand, Judge Sacavage appointed Michael Seward, Esquire to represent

Haight. *See Doc. 23-14.* Seward later filed a motion for leave to withdraw from

representation and a no-merit letter, and Judge Sacavage granted that motion and

deemed Seward's appearance withdrawn. *See Doc. 23-15* and *Doc. 23-16.* After

Haight accused Judge Sacavage of bias and ill will toward him, to avoid any

appearance of impropriety, in January of 2012, Judge Sacavage recused himself.

*See Doc. 23-17.*

In March of 2012, Judge Saylor issued a notice pursuant to Pennsylvania

Rule of Criminal Procedure 907[2] of his intent to dismiss Haight's PCRA petition.

---

[2]      Pa.R.Crim.P. Rule 907(1) provides:

*See Doc. 23-18.*  After Haight responded to that notice, Judge Saylor ordered him

to file an amended response specifically stating the facts supporting any claims he

is making. *See Doc. 23-19.*  Haight then file an amended response setting forth six

claims: (1) that Greco was ineffective by failing to file a motion to suppress;

(2) that Greco was ineffective by failing to use the testimony of four witnesses,

who were subpoenaed, present at the trial, and willing to offer an alibi that Haight

was living with them at the time in question; (3) that the Commonwealth violated

his constitutional rights by prosecuting and imprisoning him without state

constitutional authority to do so because of the lack of a savings clause in

Pennsylvania's 1968 Constitution; (4) that the Commonwealth violated his

constitutional rights by arresting, prosecuting, and imprisoning him using repealed,

unlawful, and void statutes; (5) that the Commonwealth violated his constitutional

rights by prosecuting, sentencing, and imprisoning him without subject-matter

---

> [T]he judge shall promptly review the petition, any answer by
> the attorney for the Commonwealth, and other matters of record
> relating to the defendant's claim(s).  If the judge is satisfied from
> this review that there are no genuine issues concerning any
> material fact and that the defendant is not entitled to post-
> conviction collateral relief, and no purpose would be served by
> any further proceedings, the judge shall give notice to the parties
> of the intention to dismiss the petition and shall state in the
> notice the reasons for the dismissal.  The defendant may respond
> to the proposed dismissal within 20 days of the date of the
> notice.  The judge thereafter shall order the petition dismissed,
> grant leave to file an amended petition, or direct that the
> proceedings continue.

jurisdiction to do so; and (6) that the Commonwealth violated his constitutional

rights by abridging his privileges and immunities under the United States

Constitution. *See Doc. 23-20.*

In May of 2012, Judge Saylor dismissed Haight's PRCA petition. *See Doc.*

*23-21.* The Superior Court subsequently affirmed the order dismissing the PCRA

petition. *See Commonwealth v. Haight,* No. 1085 MDA 2012, slip op. at 10 (Super.

Ct. Aug. 21, 2013) (copy filed as *Doc. 23-26*). With respect to counsel's failure to

call witnesses, the Superior Court stated that Haight "has not identified the

witnesses that purportedly had exculpatory testimony, demonstrated trial counsel

was aware of those witnesses, or included any witness affidavits averring their

proposed testimony." *Id.* The Superior Court also noted that on direct appeal, it

had refused to conclude that Greco was ineffective for failing to call Bingaman and

Costa reasoning that Haight failed to demonstrate that Greco was aware of

Bingaman and that Costa's testimony was not exculpatory. *Id.* at 10 n.9.

### F. This Habeas Petition and Proceedings.

In September of 2013, Haight filed a petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 challenging his 2003 conviction. In accordance with

*Mason v. Meyers*, 208 F.3d 414 (3d Cir. 2000), we notified Haight of the effects of

filing a § 2254 petition in light of the Antiterrorism and Effective Death Penalty

Act, and we ordered Haight to complete an election form electing either to stand on his current petition or to withdraw the current petition so that he can file an all-inclusive petition.  Haight completed the election form choosing to withdraw his petition so that he may file one all-inclusive petition.  Given Haight's election to withdraw his petition, we recommended that Haight's motion for the appointment of counsel be denied and that his habeas petition be deemed withdrawn.

Haight filed objections to our report and recommendation and an amended petition, which Judge Kane construed as his all-inclusive Section 2254 petition. Although Judge Kane overruled Haight's objections and denied his motion for the appointment of counsel, because Haight had filed an amended petition, she declined to adopt the recommendation that the petition be deemed withdrawn. Judge Kane directed the Clerk of Court to serve a copy of Haight's amended petition (doc. 8) on the respondent and ordered the respondent to respond.  She later remanded the case to the undersigned.

Although the respondent filed a response, she responded to the claims in Haight's original petition rather than the claims in his amended petition.  At that point, given the history of this case and the very general nature of Haight's claims[3]

_____

[3]  In his amended petition, Haight set forth his claims as (1) a denial of due process—he contends that he was denied a suppression hearing, an investigation, and witnesses (unnamed); (2) a denial of a fair trial—he contends he was denied witnesses (unnamed); (3) ineffective assistance of counsel—no specifics set forth; and (4) negligence of all attorneys. *See Doc. 8.*

in his amended petition, we appointed counsel to represent Haight.  We directed

counsel for Haight to file a brief addressing the claims in the amended petition, we

directed the respondent to then file a responsive brief, and we stated that counsel

for Haight may then file a reply brief.

Haight, through counsel, filed a brief in support of his amended petition.

The respondent filed a responsive brief.  Haight did not file a reply brief.


### III.  The Standards for Addressing Habeas Claims on the Merits.

In addition to overcoming procedural hurdles, a state prisoner must meet

exacting substantive standards in order to obtain habeas corpus relief.  As amended

by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C.

§ 2254 limits the power of a federal court to grant a state prisoner's petition for a

writ of habeas corpus. *Cullen v. Pinholster,* 563 U.S. 170, 181 (2011).  A federal

court may not grant habeas corpus relief with respect to any claim that was

adjudicated on the merits in state court unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States;  or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

28 U.S.C. § 2254(d).

The standard under Section 2254(d) is highly deferential and difficult to meet. *Cullen,* 563 U.S. at 181.  It "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter,* 562 U.S. 86, 102-103 (2011) (quoting *Jackson v. Virginia,* 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).  State courts are presumed to know and follow the law, *Woods v. Donald,* 135 S.Ct. 1372, 1376 (2015), and Section 2254(d) "'demands that state-court decisions be given the benefit of the doubt.'" *Cullen,* 563 U.S. at 181 (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002)).

Under Section 2254(d)(1), only the holdings, not the dicta, of the Supreme Court constitute "clearly established Federal law." *Howes v. Fields,* 132 S.Ct. 1181, 1187 (2012).  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen,* 563 U.S. at 181.  Under the "contrary to" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing

legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.* at 413.  But federal habeas relief may be granted only if the state court's application of clearly established federal law was objectively unreasonable. *Keller v. Larkins*, 251 F.3d 408, 418 (3d Cir. 2001). "[A]n incorrect application of federal law alone does not warrant relief." *Id.* "[I]f the state-court decision was reasonable, it cannot be disturbed." *Hardy v. Cross,* 132 S.Ct. 490, 495 (2011).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter,* 562 U.S. at 101 (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).  "When assessing whether a state court's application of federal law is unreasonable, 'the range of reasonable judgment can depend in part on the nature of the relevant rule' that the state court must apply." *Renico v. Lett*, 559 U.S. 766, 776 (2010) (quoting *Yarborough,* 541 U.S. at 664).  "Because AEDPA authorizes federal courts to grant relief only when state courts act *unreasonably,* it follows that '[t]he more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fairminded judges—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" *Id.* (emphasis in original).

Under the "unreasonable determination of the facts" provision of § 2254(d)(2), the test "is whether the petitioner has demonstrated by 'clear and

convincing evidence,' § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record." *Roundtree v. Balicki,* 640 F.3d 530, 537-38 (3d Cir. 2011).  "[T]he evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication." *Id.* at 538.

## IV.  Ineffective Assistance of Counsel Standards.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence." U.S. Const. amend VI.  The purpose of the right to the assistance of counsel is to ensure a fair trial, and "the Court has recognized that 'the right to counsel is the right to the effective assistance of counsel.'" *Strickland v. Washington,* 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*  "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).  The clearly established federal law as to an ineffective-assistance claim is the standard set forth in *Strickland,* 466 U.S. at 687, which requires a two-part analysis.

Under the first prong of *Strickland*, the petitioner must establish that counsel's performance was deficient. *Id.* at 687. To do so, he must establish that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. As such, the court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance," *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland,* 466 U.S. at 689), and "[t]o overcome that presumption, a defendant must show that counsel failed to act 'reasonabl[y] considering all the circumstances.'" *Cullen v. Pinholster,* 563 U.S. 170, 189 (2011) (quoting *Strickland,* 466 U.S. at 688). "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Richter,* 562 U.S. at 104 (quoting *Strickland,* 466 U.S. at 687).

Under the second prong of *Strickland*, the petitioner must establish prejudice. *Strickland,* 466 U.S. at 687. To do so, the petitioner must show a reasonable probability that, if not for counsel's errors, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen,* 563 U.S. at 189 (quoting *Harrington,* 562 U.S. at 112).

38

To prevail on an ineffective-assistance claim, a petitioner must satisfy both prongs of *Strickland*.  A court can choose which prong of the standard to apply first, and it may reject an ineffectiveness claim on the ground that the petitioner was not prejudiced without addressing whether counsel's performance was deficient. *Strickland,* 466 U.S. at 697.

"Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105.  When the state court has decided the claim on the merits, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).  "And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*

## V.  Discussion.

Haight's counsel briefed only Haight's claim that Greco was ineffective by failing to call witnesses and the only witnesses specifically mentioned are Amber

Bingaman and Louis Costa.  Thus, we limit our discussion to the ineffective-assistance-of-counsel claim based on Greco's failure to call Bingaman and Costa as witnesses at trial.

Although the Pennsylvania courts use slightly different language to articulate the ineffectiveness standard, the standard used by the Pennsylvania courts is consistent with the *Strickland* standard. *Werts v. Vaughn*, 228 F.3d 178, 204 (3d Cir. 2000) (concluding that the Pennsylvania courts applying the standard from Pennsylvania cases did not apply a rule of law that contradicts *Strickland* and finding that the state court's decision was not contrary to established Supreme Court precedent).  Thus, Superior Court's decision on Haight's ineffective-assistance-of-counsel claims was not contrary to clearly established federal law. So we turn to whether the decision resulted in a decision that involved an unreasonable application of clearly established federal law or that was based on an unreasonable determination of the facts in light of the evidence presented in the state court.

### A.  Amber Bingaman.

Amber Bingaman testified at the PCRA hearing about the vulgar messages that Gloria and Megan left on Haight's answering machine.  Haight contends that Greco should have called Bingaman as a witness at trial because her testimony

shows Gloria's hostility toward Haight because of his new girlfriend. *Doc. 32* at 5-6.

The Superior Court concluded that Greco was not ineffective by failing to call Bingaman as a witness at trial because "[t]here was no showing at the PCRA hearing that trial counsel was ever made aware of Amber Bingaman or that she was available to testify." *Commonwealth v. Haight,* No. 737 MDA 2004, slip op. at 4 (Super.Ct. June 27, 2005) (copy filed as *Doc. 23-8*). Haight suggests that the Superior Court's determination that Greco did not know of Bingaman was based on an unreasonable determination of the facts in light of the evidence presented.

Haight points to a copy of a subpoena to Bingaman to appear at trial and a cover letter from Greco to Bingaman enclosing that subpoena. *See Doc. 32* at 7 and *Doc. 7-1* at 92-93. But when reviewing a claim under §2254(d)(1), the habeas court is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen,* 563 U.S. at 181. And Haight has not shown that the subpoena was presented to the state courts. Thus, we do not consider the subpoena.

Haight did, however, testify at the PCRA hearing that he told Greco about Amber Bingaman and that she could testify about Gloria coaching the kids. *Doc. 1-1* (*PCRA Transcript* at 31). He testified that Greco was going to call Bingaman. *Id.* And Bingaman testified that if she had gotten a subpoena, she would have

testified at the trial. *Id.* at 4.  While Greco testified that Haight had given him names of witnesses he wanted to call at trial, he was not sure if Haight had told him about telephone calls that Gloria made to his residence. *Id.* at 45 & 48.

Even if the Superior Court's decision was based on an unreasonable determination that Greco did not know about Bingaman and that Bingaman was not available to testify at trial, for the reasons discussed below, even under a *de novo* standard of review, we cannot conclude that Greco was ineffective by failing to call Bingaman as a witness at trial. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, see § 2254(a).").

Considering all the testimony, both at trial and at the PCRA hearing, there is not a reasonable probability that if Bingaman had testified at trial, the result of the trial would have been different.  While Bingaman's testimony may have shown that Gloria was hostile because of Haight's new girlfriend, Linda Lahr's testimony at trial showed Gloria's hostility.  Moreover, although charges were not brought against Haight until 2001, Megan did, in 1994 (which is long before Haight and Lahr became a couple and before the answering-machine messages that Bingaman testified about) report to her Aunt what Haight was doing.  Thus, while

42

Bingaman's testimony may have added to the evidence of Gloria's hostility, it does not show that Megan fabricated the allegations at Gloria's insistence or because of Gloria's hostility toward Haight and Lahr.  Moreover, given the strong evidence against Haight presented at trial including Megan's testimony, Linda Lahr's testimony about what Haight told her, and Haight's confession to Detective Quinn, there simply is not a reasonable probability that had Bingaman testified at trial the result of the trial would have been different.  In sum, Haight was not prejudiced by Greco's failure to call Bingaman as a witness.  Accordingly, Haight is not entitled to habeas relief on his claim of ineffective assistance of counsel for failure to call Amber Bingaman as a witness at trial.

### B.  Louis Costa.

Haight claims that Greco was ineffective by failing to call Louis Costa.  At the evidentiary hearing on Haight's PCRA petition, Costa testified that in 1994, Haight was living in Elk County, not with Gloria and Megan. *PCRA Transcript* at 21.  According to Costa, Haight was at his mother's house in Elk County visiting relations. *Id.* at 24.  Costa testified that he took Haight up to Elk County and dropped him off, but he was not with Haight the entire time when Haight was in Elk County. *Id.* at 24-26.  Haight himself, however, testified at the PCRA hearing that he only stayed in Elk County in 1994 for two weeks. *Id.* at 43.

The Superior Court concluded that Haight was not prejudice by Greco's failure to call Costa at trial because the two-week period Haight was in Elk County was not sufficient to show that Haight had an alibi or to otherwise exculpate Haight.  The Superior Court's conclusion that Costa's testimony was not exculpatory was not unreasonable.  This is especially so given that the testimony at trial was that during Haight and Gloria's marriage, they only occasionally lived together, and the testimony at trial was not that they were living together at the time Haight was sexually abusing Megan.  Moreover, given the strong evidence against Haight at trial, there is not a reasonable probability that had Costa testified at trial the result of the trial would have been different.  Under the "doubly deferential" standard that applies to a *Strickland* claim evaluated under 28 U.S.C. § 2254(d)(1), *Knowles*, 556 U.S. at 123, the Superior Court's decision was not unreasonable.  Accordingly, Haight is not entitled to habeas relief on this claim of ineffective assistance of counsel for failure to call Louis Costa as a witness at trial.

## VI. Recommendation.

For the foregoing reasons, **IT IS RECOMMENDED** that Haight's petition for a writ of habeas corpus be **DENIED**.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in

28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 4th day of April, 2016.

**_S/ Susan E. Schwab_**
Susan E. Schwab
United States Magistrate Judge